# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS HOLLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 CV 9191 |
| v. | ) | |
| | ) | |
| SOO LINE RAILROAD COMPANY | ) | |
| d/b/a CANADIAN PACIFIC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Douglas Holloway ("Plaintiff" or "Holloway") brings this action against Defendant Soo Line Railroad Company d/b/a Canadian Pacific ("Defendant" or "CP") after Defendant terminated Plaintiff's employment following an incident with a Kubota utility vehicle at CP's rail yard. The parties have filed cross-motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56(a). Specifically, Plaintiff moves for summary judgment on Count I, in which he alleges a violation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and Count III, in which he brings a claim pursuant to the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109 *et seq.* Defendant moves for summary judgment on Count II, Plaintiff's reverse discrimination claim brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and Plaintiff's FRSA claim in Count III. For the following reasons, the Court denies Plaintiff's motion for partial summary judgment and grants Defendant's motion for partial summary judgment. The only remaining claim in this lawsuit is Plaintiff's FELA claim as alleged in Count I.

**BACKGROUND**

**I.      Northern District of Illinois Local Rule 56.1**

Northern District of Illinois Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994)).  Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law."  L.R. 56.1(a)(3); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 291 (7th Cir. 2015).  The nonmoving party must file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  L.R. 56.1(b)(3)(B); *Petty v. Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).  The nonmoving party also may submit a separate statement of additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other materials relied upon to support those facts.  L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

The purpose of Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments.  *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).  Moreover, Local Rule 56.1 response requirements are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th

2

Cir. 2000). Also, "[t]he non-moving party's failure to admit or deny facts as presented in the moving party's statement or to cite to any admissible evidence to support facts presented in response by the non-moving party render the facts presented by the moving party as undisputed." *Curtis*, 807 F.3d at 218–19; *see also Cracco v. Vitran Exp., Inc*., 559 F.3d 625, 632 (7th Cir. 2009) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."). Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809–810 (7th Cir. 2005).

After carefully reviewing the parties' Rule 56.1 statements, the parties have failed to follow the dictates of Local Rule 56.1 in several ways. *See Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) ("The district court's discretion to require strict compliance with Local Rule 56.1 has been upheld time and again."). In response to certain statements of fact, for example, the parties admit the facts but then supplement the facts with further details or a legal conclusion. (*See, e.g*., R. 64 at ¶ 3; R. 68 at ¶ 15.) At times, Defendant fails to cite to the record, making factual statements without a single reference to the record. (*See, e.g*., R. 64 at ¶ 31.) Moreover, Defendant attempts to create factual disputes by challenging the inferences or implications that can be drawn from the evidence (*See, e.g*., R. 68 at ¶ 5.), or denying allegations in an exhibit (*See, e.g*., R. 68 at ¶ 6.). Defendant also includes multiple factual premises in one large paragraph instead of splitting the facts up into short, numbered paragraphs as required. (*See, e.g*., R. 64 at ¶ 55.) Additionally, Plaintiff misquotes exhibits or otherwise misstates the evidence. (*See, e.g*., R. 68 at ¶ 67, 70.) In its review of the facts, the Court disregards the factual statements where the parties fail to adhere to Rule 56.1.

## II.    Admissible Evidence

When reviewing a summary judgment motion, courts may only consider admissible evidence.  Fed. R. Civ. P. 56(c); *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312-14 (7th Cir. 2017).  "To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'"  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)).  In particular, Rule 56(c) provides that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *Id*.  Further, an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *Id*.  "A verified complaint is the equivalent of an affidavit for summary judgment purposes."  *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013).

Rule 56 further instructs that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: "(1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting

materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

In addition, Federal Rule of Evidence 901(a) demands that the proponent of evidence authenticate or identify the item of evidence by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *Devbrow*, 735 F.3d at 586-87 (affirming a district court's grant of summary judgment based on its decision to strike a document the plaintiff "failed to authenticate" under Rule 901). "Under Federal Rule of Evidence 901, evidence must be authenticated as a condition precedent to its admissibility." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 627 (7th Cir. 2008) (affirming a district court's grant of summary judgment based on its decision to strike a document because the evidence was "uncertified" under Rule 901). Rule 901 lists examples of evidence that can authenticate or identify an item of evidence, including testimony of a witness with knowledge "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

With these standards in mind, the Court turns to the relevant facts of this case.

## III. Relevant Facts

### A. Parties

Plaintiff Douglas Holloway is male. (R. 47-2, Pl.'s Ex. 1, ¶6.) He began his employment with CP in July 2014 and, at the time of the Kubota incident on October 18, 2015, Defendant employed him as a conductor. (Pl.'s Ex. 1, ¶8; Def.'s Ex., Tab A, p. 102.) Holloway received training as a conductor from both CP as well as his former railroad company employer. (Def.'s Ex., Tab A, pp. 55, 79, 80-81; Def.'s Ex., Tab J.) As such, he had at least four years of railroad work experience before joining CP. (Def.'s Ex., Tab A, pp. 53-57; Def.'s Ex., Tab C.)

Defendant Soo Line Railroad Company d/b/a Canadian Pacific is a Class I railroad that

provides freight rail transportation services.  (R. 56, Cobb Decl., ¶ 3.)  One of CP's rail yard facilities is located in Franklin Park, Illinois (the "Bensenville Yard").  (*Id.*)

## B.     Collective Bargaining Agreement

A collective bargaining agreement ("CBA") between the United Transportation Union ("UTU") and CP governs the terms and conditions of Plaintiff's employment as a conductor. (Def.'s Ex., Tab A, pp. 86-87.)  The CBA governs bidding rights, pay rates, benefits, seniority, furloughs, and other matters.  (*Id.* at 86- 87, 89.)  It applies to all crafts and classes of road service and yard service employees including conductors and brakemen.  (R. 60, Dittrich-Bigley Decl., Tab A.)  With regard to furloughs, the CBA provides under Article 12-1, entitled "Reduction in Forces," that "[w]hen forces are reduced, employees will be laid off in the reverse order of seniority and will be notified in writing that they have been furloughed."  (*Id.*)

Under Article 9, the CBA provides covered employees with the right to a formal hearing/investigation to determine facts prior to the imposition of any discipline.  (Def.'s Ex., Tab A, pp. 89-91; Dittrich-Bigley Decl., Tab. A.)  An employee must first receive a written hearing notice within 10 days "after a company [o]fficer having authority to order an investigation has information of the offense of the charges pending," informing him/her of the nature of the charges and the date of the formal hearing/investigation.  (Dittrich-Bigley Decl., Tab A.)  A union representative can represent CBA-covered employees like Holloway at the formal hearing.  (Dittrich-Bigley Decl., ¶ 4; *see also* Def.'s Ex., Tab A, pp. 91-92.)  CBA-covered employees have the opportunity to present their cases at the formal hearing as governed by admissibility rules through testimony, exhibits, witnesses, and cross-examination.[1]  (*Id.*)

---

[1] Plaintiff does not dispute this provision but claims that he was denied "the opportunity to present his case through testimony and witnesses."  (R. 62 at 6-7.)  He further alleges that only CP "can require witnesses to appear at the formal investigation."  (*Id.*)  His citation to Dittrich-Bigley Decl. Tab A, Art. 9(p) and (q), however, does not advance his point.  Those sections merely discuss CP paying not-at-fault employees for their time at a hearing.

The formal hearing develops the facts surrounding the incident and allows CP to determine the employee's responsibility, if any, in connection with the incident in question. (Dittrich-Bigley Decl., ¶ 4.)  CP must issue a decision within 10 days of the formal hearing/investigation.  (Dittrich-Bigley Decl., Tab A, Side Letter No. 7(c).)  The CBA allows for appeals of any determination made pursuant to a formal hearing up to the highest designated officer on the property and, ultimately, if appealed further, to a public law board.  (Dittrich-Bigley Decl., ¶ 5; *see also* R. 53-2, Def.'s Ex., Tab OO.)

### C.    Other Company Policies

In addition to the governing CBA, CP also has implemented various workplace policies that prohibit discrimination on legally protected grounds and provide employees with an internal complaint procedure to report their concerns about discrimination and retaliation.  (Def.'s Ex., Tab A, pp. 104-05; Def.'s Ex., Tabs G, H.; *see also* Cobb Decl., Tab A.)  Plaintiff admits that he received training and an overview of these employment policies, but that he did not bring a complaint of discrimination to CP's human resources department or anyone else under the internal complaint procedure.  (Def.'s Ex., Tab A, pp. 106-107, 112; Def.'s Ex., Tab J.)

Another CP policy, "Incident/Accident Injury and Occupational Illness Reporting Policy and Commitment Regarding Intimidation and Harassment," gives whistleblower protection "to any person making use of this policy to report a violation" and provides written reporting procedures.  (Def.'s Ex., Tab I; Def.'s Ex., Tab A, p. 114.)  Holloway admits he made no complaints under this policy.  (Def.'s Ex., Tab A, p. 116).

### D.    Safety Rules

As a railroad conductor, Holloway admits he is required to know, understand, and comply with the safety rules, including CP's operational rules called the General Code of

Operating Rules ("GCOR") (Def.'s Ex., Tab A, pp. 81-82, 86; Def.'s Ex., Tabs F, J.) as well as the Train & Engine Safety Rule Book ("SRB") (Def.'s Ex., Tab A, p. 82; Def.'s Ex., Tab E.). Plaintiff further admits that the safety-sensitive position of a conductor involves working in and around dangerous and moving equipment, and that failure to work safely can result in injury or death to himself and others. (Def.'s Ex., Tab A, pp. 77-78.) Holloway acknowledges that he is required to have a copy of the GCOR available on his shift so he can check the rules on the job, and also that he should consult the bulletin board notices every day before starting work. (*Id.* at pp. 82-84.)

The content of Rule T-4 of the SRB is at issue in this case. The rule provides:

T-4 Vehicles Used for Company Business

1.  Inspect vehicles for unsafe conditions before use. Repair or tag and remove from service if defective.

2.  Prior to operation of a vehicle the driver must conduct a walk around of the vehicle to identify any obstacles, clearance restrictions, or adjacent vehicles that may interfere with executing a safe movement.

\*\*\*

4.  Wear seat belt while operating or riding in motor vehicles equipped with them, unless engaged in inspections and traveling less than 15 mph (25 Km/h) on CP Property.

(R. 47-9, Pl.'s Ex. 8.) The parties dispute the meaning of these provisions.

**E.  Employment Histories of Plaintiff and Comparator**

CP had disciplined Holloway several times prior to the October 18, 2015, Kubota incident. In November 2014, CP advised and counseled Holloway on his attendance and need to comply with CP's availability standards. (Def.'s Ex., Tab A, pp. 118-22; Def.'s Ex., Tabs K, L.)

In addition, following notice and a hearing, CP determined on May 21, 2015, that Holloway had failed "to notify the engineer of intent to detrain" and also failed "to verify

switches points" in violation of safety and work rules. (Def.'s Ex., Tab A, p. 131; Def.'s Ex., Tabs M, N, O.) CP assessed him a 10-day suspension for these violations. *Id.* Plaintiff admits that he did not attend the formal investigation related to this charge. (Pl.'s Ex. 1; Def.'s Ex., Tab A, pp. 131- 134; Def.'s Ex., Tab N.) The parties dispute whether his absence from the hearing was excused. Holloway did not avail himself of any CBA appeals process.

Further, following notice and a hearing, CP determined on August 7, 2015, that Holloway had failed "to sign off on hazmat cover sheet" in violation of safety and work rules. (Def.'s Ex., Tab A, pp. 137-41; Def.'s Ex., Tabs P, Q, R.) CP assessed him a 15-day suspension for this violation. *Id.* Two months later, by letter dated October 9, 2015, Holloway was issued a notice to attend a hearing pursuant to the governing CBA for his alleged excessive absenteeism for the month of September 2015. Due to several hearing postponements, the formal hearing on this matter did not take place until December 2, 2015. After the hearing, CP determined that Holloway had failed to meet the attendance and availability requirements for September 2015, and assessed him a 30-day suspension. (Def.'s Ex., Tab A, pp. 145-49; Def.'s Ex., Tabs BB, EE, GG; R. 47-5, Pl.'s Ex. 4, pp. 59-60.). In addition to his disciplinary history, Holloway had 5 efficiency testing failures out of 55 tests. (*Id.*)

Plaintiff compares himself to J.S.,[2] a female co-worker and the driver of the Kubota during the October 18, 2015, incident. According to her Individual Roster Record, CP hired J.S. in August 2014 and promoted her to conductor in November 2014. (R. 47-9, Pl.'s Ex. 11.) CP sent J.S. a coaching letter for violating availability standards for the month of December 2014 on

[2] Although the parties filed numerous documents under seal, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010). The Court sees no benefit, however, to including the female co-worker/comparator employee's full name, especially in light of later discussions of her employment history, and will refer to her as J.S.

January 7, 2015. (*Id*.) That letter constituted her only disciplinary history entry. As to efficiency testing history, J.S. had no test failures out of 39 tests. (Def.'s Ex., Tab II.)

An October 20, 2015, letter noticed both J.S. and Holloway for a formal CBA hearing/investigation of the Kubota incident. (Def.'s Ex., Tab V; R. 47-10, Pl.'s Ex. 13, pp. 44, 47-48.) After CP issued hearing notices for the Kubota incident, but before holding the formal hearing, CP furloughed J.S. for business reasons due to a reduction in work force. (Dietrich-Bigley ¶ 20, Tab M.) Holloway was more senior than J.S. (1.3 years of service vs. 1 year of service) and the furlough did not impact him. (Def.'s Ex., Tab A, p. 88; Def.'s Ex., Tab II.)

### F. October 18, 2015, Kubota Incident

On the morning of October 18, 2015, Plaintiff and J.S. were working the FL-1 job as conductor and brakeman, respectively. (R. 47-4, Pl.'s Ex. 3, pp. 179, 238.) Their job that morning was a "switch job," switching cars to build trains. (*Id*. at pp. 232, 238.)

Plaintiff and J.S. used an all-purpose utility vehicle called a Kubota to get around the Bensenville Yard that morning. The parties do not dispute that J.S. was the driver and Holloway was the passenger in the Kubota. Holloway testified that J.S. picked up the Kubota and drove the Kubota to him. (*Id*. at pp. 316-317.) Holloway further testified that he assumed that J.S. had inspected the vehicle before driving it. (*Id*.) The parties dispute if CP provided Holloway and J.S. with formal training on the operation of the Kubota. (Pl.'s Ex. 4, pp. 22-23; Pl.'s Ex. 3, pp. 229-30.)

Later that morning, CP trainmasters John Randell and Jason Limberg received radio notification to respond to an injury. (Def.'s Ex., Tab X, p. 4; Def.'s Ex., Tab EE.) The supervisor-managers found Holloway and J.S. by the Kubota. (*Id*.) Limberg took photographs of the Kubota. (R. 47-9, Pl.'s Ex. 9, p. 14.) When questioned, the employees told Randell that

the Kubota had struck a switch stand (metal pole) and made an abrupt stop after impact. (Donesky Decl. Tab X at 4; Donesky Decl. Tab EE.)

Limberg observed the windshield had dirt and scratches on it, and that the windshield was secured to the Kubota with zipties. (Pl.'s Ex. 9, 16-17.) It is undisputed that the zipties were placed on the Kubota before the incident occurred. (*Id*.) Holloway testified that he believed "someone repaired" the windshield because of the zip ties. (Pl.'s Ex. 3, p. 316.) During the December 2, 2015, hearing investigation, Holloway stated that his only evidence that this vehicle's windshield was reported was that "[o]ther employees have told me they reported it." (Def.'s Ex., Tab X, p. 15.)

The day of the incident, Limberg emailed Nicholas Sohns and Edward Steinbeck, and stated that Kubota vehicles with Plexiglas windshields should have the Plexiglas removed. (Pl.'s Ex. 9, p. 28, Dep. Ex. 2.) In Limberg's opinion, it would be better to have no windshield than Plexiglas that is easily scratched and through which visibility with glare is poor. (*Id*.) Limberg testified that in response to his e-mail regarding windshield removal, he was not told "no," but he never received a follow-up on it. (Pl.'s Ex. 9, p. 37.)

Randell noticed that the Plexiglass windshield "was busted out, broken on one side." (*Def*.'s Ex., Tab X, p. 5; *see also* Def.'s Ex., Tab EE.) When questioned, Holloway stated that he hit his head against the Plexiglass after the abrupt stop and this caused the windshield to pop off. (*Id*.) Furthermore, Holloway testified that the impact of the crash also caused his knees to hit the dashboard. (Pl.'s Ex. 3, p. 261.) Originally, Holloway did not want medical attention, but he later changed his mind, and Limberg took both Holloway and J.S. to the hospital. (Def.'s Ex., Tab X, p. 5; Pl.'s Ex. 9, p. 18.)

The parties agree that neither Holloway nor J.S. was wearing a seatbelt in the Kubota. (Pl.'s Ex. 3, pp. 158, 161.)  The parties dispute if Holloway "could not find" or "did not see" the seatbelt.  Holloway maintains that Kubotas are usually equipped with seatbelts and he has used different Kubotas during his time with CP, but that the Kubota he rode in on October 18, 2015, did not have seatbelts on the passenger side.  (Pl.'s Ex. 18, pp. 13-14, 16.)  Defendant points out that Holloway stated during his deposition that he simply "did not *see* a seatbelt on the passenger side." (Pl.'s Ex. 18, pp. 13, 14, 17 (emphasis added).)

Various witnesses have testified that the Kubota had lap belts, although no one confirmed that they were operational.  Limberg testified that he checked the Kubota and found seatbelts across the lap for both the driver and passenger, but did not check to see if they were operational. (Pl.'s Ex. 9, pp. 22-23.)  One of CP's claims representatives, Michael Schmidt, testified that the Kubota had seatbelts and that he took pictures of the seatbelts.  (Pl.'s Ex. 7, pp. 6-13, 24, 35.) Schmidt did not check if the seatbelts were operational.  (*Id*. at p. 35.)  Lastly, CP employee Edward Steinbeck stated at the formal hearing that he had inspected the Kubota on that day and found lap belts in the crease on both the driver and passenger side.  (Pl.'s Ex. 18, p. 21.)

Holloway also claims that he did not have to wear a seatbelt because he was in a Kubota performing inspections and traveling less than 15 mph, and thus SRB Rule T-4 Section 4's seatbelt exception applied to him.  (Pl.'s Ex. 3, pp. 251-253, 317.)  Defendant asserts, and Plaintiff does not dispute, that Plaintiff "never made such claims of performing inspections at the actual CBA hearing/investigation where he was given every opportunity to explain his alleged rule violation." [3]  (R. 68 at ¶ 9 (citing Def.'s Ex., Tab X).)

---

[3] Although the parties do not dispute the admissibility of Holloway's interview transcript (unlike J.S.'s interview transcript), Holloway also failed to make such assertions during his statement to CP.  (Pl.'s Ex. 10.)

J.S. and Holloway each reported personal work injuries to CP. (Pl.'s Ex. 3, pp. 179-180; Pl.'s Ex. 12, p. 46.) Holloway's injury was also reportable under the Federal Railway Act ("FRA") guidelines because Holloway was given a prescription of Flexeril. (Pl.'s Ex. 12, pp. 22-25, Dep. Ex. 2.) J.S.'s injury was not FRA-reportable. (*Id.*) CP claims that its policies do not distinguish between a "reportable" and "non-reportable" injury for internal reporting purposes. (Def.'s Ex., Tab HH, pp. 50-51.) CP's briefing notice for the incident, however, distinguished the two injuries as reportable versus non-reportable for the purposes of the FRA. (R. 47-10, Pl.'s Ex. 24.)

Schmidt met Holloway and J.S. at the hospital. (Pl.'s Ex. 7, p. 12.) Schmidt took Plaintiff's statement at the hospital. (Pl.'s Ex. 3, p. 227; Pl.'s Ex. 7, p. 16.) He took J.S.'s statement later that same day at the Bensenville Yard office. (Pl.'s Ex. 7, p. 16.)

### F.    Notice, Formal Investigation, and Hearing

Pursuant to CP's regular protocol, a post-incident field investigation was undertaken and reported to a team of CP representatives, including David Carroll, general manager of the Bensenville Yard. (Pl.'s Ex. 12, pp. 21-22; Def.'s Ex., Tab II.) Limberg prepared an email report dated October 18, 2015, to Carroll and others consistent with the format CP used at the time. (Pl.'s Ex. 12, p. 22; Def.'s Ex., Tab II; Pl.'s Ex. 9, p. 28, Dep. Ex. 2.) The report contains a description of the event, identifies the employees involved, and details the employees' employment histories, including seniority or years of service, disciplinary investigations and suspensions, and efficiency testing results. (Def.'s Ex., Tab II.)

As the general manager, Carroll determined whether to proceed to a formal hearing, what potential rule violation applied based on the field investigation, and who would serve as the hearing officer at the formal CBA investigation hearing. (Pl.'s Ex. 12, pp. 26-30.) CP issued a

hearing notice dated October 20, 2015, to both Holloway and J.S. (Def.'s Ex., Tab JJ.) CP addressed the notice to both employees and stated that the purpose of the hearing "will be to determine all the facts and circumstances and to place responsibility, if any, in connection with your alleged: * Failure to wear a seat belt while riding/operating the Kubota utility vehicle. * Failure to safely operate the Kubota utility vehicle when colliding with a switch stand." (*Id.*) It further advised them of their right to have a representative of their choice at the hearing. (*Id.*)

The formal CBA hearing/investigation was originally scheduled for October 27, 2015, but did not take place until December 2, 2015 because of multiple postponements by both the union and CP. (Def.'s Ex., Tabs W, KK, LL; Def.'s Ex., Tab A, pp. 153- 54.) CP sent both Plaintiff and J.S. letters informing them of the formal hearing date change three times. (Pl.'s Ex. 15; Pl.'s Ex. 16; Pl.'s Ex. 17.)

A union representative requested one of those three date changes. On November 9, 2015, union representative Joseph Adelfio sent an email to John Cartlidge, Train and Engine Employee Availability Advisor, asking how to word his request to postpone the investigation until J.S. returns from furlough. (R. 47-10, Pl.'s Ex. 13, p. 19, Dep. Ex. 3.) Cartlidge replied "our advice is to hold the Hearing. Just because [s]he's furloughed doesn't mean [s]he can't participate in a Hearing. [Sh]e may never come back and there is another employee involved." (*Id.*)

CP held separate and independent formal hearings for Holloway on December 2, 2015. (Pl.'s Ex. 18.) A union representative represented Holloway at both hearings. (Def.'s Ex., Tabs T, X.) The first hearing pertained to Holloway's alleged excessive absenteeism for the month of September 2015, which was first noticed for hearing on October 9, 2015, before the Kubota incident and Plaintiff's subsequent reporting of a work injury. The second hearing pertained to Holloway's alleged failure to wear a seatbelt while riding/operating the Kubota on October 18,

14

2015. Jim Gilbert served as the hearing officer for these separate and independent hearings. (Def.'s Ex., Tabs EE, GG.) Gilbert reviewed each hearing record and exhibits, and prepared a separate summary and recommendation for each. (*Id.*; Pl.'s Ex. 4, pp. 58- 60.)

The first hearing, involving Holloway's alleged excessive absenteeism for the month of September 2015, established that Holloway had missed work on three separate dates in September 2015, in violation of CP's attendance and availability requirements. (Def.'s Ex., Tabs EE, GG.) The record further showed that Holloway's attempt to submit medical paperwork to excuse his absences did not match up with the time for the missed calls and that Holloway failed to submit the paperwork in the required timeframe. (*Id.*) Gilbert concluded that the record established that Holloway had failed to excuse his three absenteeism events. (*Id.*) He recommended that CP suspend Plaintiff for 30 days. (*Id.*)

The second hearing pertained to the Kubota incident. Holloway, Gilbert, Randell, Steinbeck, and Robert Denson (Holloway's UTU representative, who also represented J.S.) all attended the hearing. (Pl.'s Ex. 18.) J.S. did not attend the formal investigation on December 2, 2015. (Pl.'s Ex. 13, p. 49.) According to Defendant, J.S. did not attend because she was on furlough. Plaintiff, however, disputes that her absence was excused by the furlough. Also at the second hearing, Denson objected to all testimony about J.S. on account of her absence. (Pl.'s Ex. 18, p. 4.) Denson stated that J.S. was furloughed and seeking new employment, and not available to come to work. (*Id.* at p. 5.) Gilbert sustained this objection and stated that to his knowledge, they could not make contact with J.S. and "for whatever reason [she was] not able to [attend], [she] is not here and present here today." (*Id.* at p. 4.) Accordingly, the hearing proceeded as to Holloway only. (Def.'s Ex., Tab X, pp. 4-5; Def.'s Ex., Tab EE; Pl.'s Ex. 5, p.

4.)  Denson did not object on Holloway's behalf to proceeding with the hearing as to Holloway without J.S.'s presence.  (Def.'s Ex., Tab X, pp. 4-5; Pl.'s Ex. 13, pp. 50-51; Def.'s Ex., Tab EE.)

Randell testified at the hearing that he believed that Holloway was the passenger in the vehicle and that Holloway was not wearing a seatbelt because his body popped the Plexiglass windshield out of the Kubota.  (Pl.'s Ex. 18, p. 5-6.)  Randell further testified that the SRB Rule T-4 requirements applied to Holloway, and that he should have inspected the vehicle and been wearing his seatbelt.  (*Id.* at pp. 5-6, 9-10.)

Holloway stated at the hearing that SRB Rule T-4 requires only the driver to check the vehicle, that the windshield had been reported previously, and that he did not see any seatbelts in the Kubota.  (*Id.* at p. 12.)  Holloway, however, has only presented inadmissible hearsay to support his claim that the windshield had been reported previously, stating that "[o]ther employees have told [him] they reported it."  (*Id.* at p. 15.)  It is undisputed that Holloway did not make an unsafe condition report in connection with the Kubota on October 18, 2015.  (Pl.'s Ex. 3, p. 159.)  Further, while Holloway claimed he had seen other reports regarding "safety concerns about the conditions of the vehicles," he admitted that he never saw a report or had personal knowledge of a report about that specific Kubota.  (*Id.* at pp. 159-60.)  Holloway also admitted that he never asked J.S. if she could see through the windshield.  (*Id.* at pp. 322-23.)

Limberg testified at his deposition that J.S. and Holloway were required to inspect the Kubota, and they should have reported the windshield issue and not used that Kubota.  (Pl.'s Ex. 9, pp. 34-36.)  Limberg added that managers have performed Kubota audits in the past.  (*Id.* at p. 25.)  In addition, Limberg explained that "each employee that utilizes them at the beginning of each shift […is] required to inspect them and fill out a form."  (*Id.*)  Limberg testified that the

safety rule required Holloway and J.S. to wear seatbelts, and the exception to the rule only applied if they were conducting inspections and traveling 15 mph or slower. (*Id*. at pp. 23, 32.)

After the December 2, 2015, investigation/hearing and upon review of the transcript, Gilbert found that Holloway had violated SRB Rule T-4 because Holloway admitted to not wearing a seatbelt when riding in a company vehicle on CP property, and further that he did not inspect the vehicle before riding in it or file a report regarding its safety defects. (Pl.'s Ex. 4, pp. 13-14, 28-30, 35, 53; Def.'s Ex., Tab X; *see also* Def.'s Ex., Tab EE.) Further, the investigation revealed no safety defects or missing seatbelts. (Def.'s Ex., Tab GG, pp. 4-5.)

Gilbert's summary also included a review of Holloway's discipline history, which led Gilbert to his recommendation of Plaintiff's dismissal. (*Id*.; Pl.'s Ex. 4, p. 30.) As Gilbert stated in his summary: "Based on two prior disciplines, one pending discipline, and the findings of this hearing, all within a seven month timeframe, I recommend Mr. Holloway be terminated from employment at CP." (Def.'s Ex., Tab GG.) He did not make a discipline recommendation for J.S. because her hearing did not go forward, thus no evidence regarding J.S. was presented at the December 2, 2015, hearing. (Pl.'s Ex. 4, pp. 31-32.) Gilbert documented his summary and conclusions in an email to Carroll on December 10, 2015, and from that point Carroll took charge of Holloway's case. (Def.'s Ex., Tab FF.) The same email chain shows that Carroll sought input from labor relations through the post-hearing review process. (Def.'s Ex., Tab DD.) Carroll also received input through a biweekly call with US general managers and senior vice-president of operations, but "[he] had the ultimate responsibility of issuing the discipline and making the determination." (Pl.'s Ex. 12, p. 34.)

While Carroll could not recall at his deposition why he had not disciplined J.S., Carroll testified and explained that he had no knowledge of what she did because she was not present at

the CBA hearing/investigation held on December 2, 2015.  (Def.'s Ex., Tab HH, p. 43.)  Carroll based his disciplinary decision on the record created at the hearing, Gilbert's recommendation, and Holloway's discipline history.  (*Id*. at 31-32, 48-49.)  Based on the facts and substantial evidence from the hearing, Carroll determined that dismissal was appropriate.  (*Id*. at 49.)  As the general manager, Carroll approved Plaintiff's discharge from employment.  (*Id*. at 34, 49.)

## G.    Termination

Carroll sent Plaintiff a letter, dated December 11, 2015, dismissing Plaintiff from his employment with CP effective immediately.  (Def.'s Ex., Tab Y.)  The letter concluded that the findings of the investigation record as a whole contained substantial evidence proving Plaintiff had violated SRB Rule T-4.  (Pl.'s Ex. 19.)

Carroll also sent J.S. a letter, dated December 11, 2015, stating that no discipline was assessed to her for the alleged violations "failure to wear a seatbelt while riding/operating the Kubota utility vehicle" and "failure to safely operate the Kubota utility vehicle when colliding with a switch stand."  (Pl.'s Ex. 20.)  Labor relations officer Cartlidge testified that a neutral arbiter would almost certainly overturn an assessment of discipline for a worker about whom no evidence was entered during the investigation hearing.   (Pl.'s Ex. 13, p. 51.)

## H.    Like Cases[4]

CP has disciplined other employees for failing to wear a seatbelt in violation of SRB Rule T-4 and who did not report an injury.  Employee M waived his CBA right to an investigation and accepted a 10-day record suspension for failing to wear a seatbelt on August 22, 2013.  (Dittrich-Bigley Decl., Tab G.)  CP asserts that the 10-day suspension was commensurate with the

---

[4] In addition to the cases discussed in this section, Defendant also points to an incident involving the unsafe operation of a company vehicle.  (Dittrich-Bigley Decl., Tab L.)  As Plaintiff correctly points out, however, this charge implicated SRB Rules 1.1 Safety and 1.1.1 Maintaining a Safe Course, which are different than Plaintiff's alleged violation of SRB Rule T-4.

employee's prior discipline history.  (*Id*.)  Similarly, and for the same August 22, 2013, incident, Employees F and Z also waived their CBA rights to an investigation and each accepted a 5-day record suspension for failing to wear their seatbelt in a company vehicle.  (*Id*. at Tabs E, K.) None of these three employees (Employees M, F, or Z) reported any injuries associated with their incidents.  (R. 58, Petersen Decl., ¶¶ 3-5.)

In a different incident, Employee P waived his CBA right to an investigation and accepted a 10-day record suspension for failure to wear a seatbelt while driving a company vehicle.  (Dittrich-Bigley Decl., Tab I.)  Employee P had no reported injuries during his career with CP as of the parties' filings.  (Petersen Decl., ¶ 6.)

## I.       Procedural History

Plaintiff exercised his right to appeal his dismissal through the union and under the CBA in March 2016.  (Def.'s Ex., Tab A, p. 93, Dep. Ex. 33.)  CP denied the appeal in May 2016 and Holloway's appeal is currently pending arbitration before a public law board.  (Dietrich-Bigley Decl., ¶ 10, Tab C.)  In June 2016, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").  (Pl.'s Ex. 1, ¶4.)  The EEOC issued a Notice of Right to Sue on Charge Number 440-2016-04480 in July 2016.  (*Id*. at ¶5; Pl.'s Ex. 2.)  Holloway filed this case in the Northern District of Illinois on September 23, 2016.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining summary judgment motions, "facts must be viewed in the light

most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 255 (quotation omitted). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citations omitted). "On review of cross-motions for summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015).

## ANALYSIS

### I.  Count I: Federal Employers' Liability Act

First, Plaintiff moves for summary judgment on his FELA claim as alleged in Count I. Congress enacted FELA in response to the dangers inherent in working for railroads and the high rate of injuries among railroad employees. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542–43 (1994). FELA provides a "broad federal tort remedy for railroad workers injured on the job." *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998); *see also Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d 807, 812 (7th Cir. 1985). FELA "should be construed liberally to effectuate congressional intent." *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 296 (7th Cir. 2014) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987)).

FELA establishes a standard for employer liability that is more lax than common law negligence standards, and eliminates a number of traditional defenses such as contributory negligence and assumption of risk. *Williams*, 161 F.3d at 1061; *see also Consolidated Rail Corp.*, 512 U.S. at 542–43. Under FELA, "railroads are liable if carrier negligence played any part, even the slightest, in producing the injury." *Lynch v. Ne. Reg'l Commuter R.R. Corp.*, 700 F.3d 906, 911 (7th Cir. 2012); *see also CSX Transp., Inc. v. McBride*, 564 U.S. 685, 687 (2011). A plaintiff's burden under FELA is thus significantly lighter than in an ordinary negligence action. *Green v. CSX Transp., Inc.*, 414 F.3d 758, 766 (7th Cir. 2005). Moreover, a "relaxed standard of causation applies under FELA." *CSX Transp., Inc.*, 564 U.S. at 687. A plaintiff must, however, still prove "the common law elements of negligence [to prevail in a FELA case], including foreseeability, duty, breach, and causation." *Crompton*, 745 F.3d at 296 (quoting *Fulk v. Illinois Cent. R.R. Co.*, 22 F.3d 120, 124 (7th Cir. 1994)).

A FELA plaintiff "can get to the jury with even slight evidence of negligence." *Lancaster*, 773 F.2d at 820 (citing *Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506 (1957); *Heater v. Chesapeake & Ohio Ry.*, 497 F.2d 1243, 1246–47 (7th Cir. 1974)). In other words, a FELA plaintiff who "adequately raise[s] genuine issues of material fact as to negligence as required under FELA" should not have his case dismissed on summary judgment. *Lynch*, 700 F.3d at 919 (vacating and remanding where plaintiff "adequately raised genuine issues of material fact as to negligence as required under FELA").

Here, Plaintiff claims that CP is liable under FELA based on the doctrine of respondeat superior because J.S. was negligent in her operation of the Kubota. In support of his argument, relies on J.S.'s interview transcript as evidence that she was negligent as the driver of the vehicle. As Defendant correctly points out, however, "Exhibit No. 6 is a recorded statement

taken by Defendant's claims representative…and not sworn testimony, affidavit, or other record

that would be admissible at trial and is improper under Rule 56(c)(1)(A)." (R. 68 at 1.) Plaintiff

did not attach an affidavit or declaration to identify and authenticate the document per Federal

Rule of Evidence 901(a). Nor did Plaintiff point to a part of Holloway's depositions or any other

deposition in which a witness with knowledge identifies and authenticates the interview

transcript.[5] Lastly, Plaintiff's Complaint, First Amended Complaint, and Second Amended

Complaint are not verified complaints. *See Devbrow*, 735 F.3d at 587 ("A verified complaint is

the equivalent of an affidavit for summary judgment purposes."). As such, unsworn,

unidentified, and unauthenticated interview transcripts, including the J.S. interview transcript at

Plaintiff's Exhibit 6, are not admissible evidence and the Court cannot consider them on

summary judgment.[6]

Furthermore, J.S.'s interview transcript is inadmissible hearsay under Federal Rule of

Evidence 801(c). To clarify, Plaintiff seeks admission of J.S.'s interview transcript "to prove the

truth of the matter asserted," but J.S. did not make the statement "while testifying at the current

trial or hearing." *Id*. The only other evidence about the incident comes from Holloway (who has

personal knowledge of the event, but not of J.S.'s judgment and thinking), or other parties who

either saw the aftermath but not the incident or spoke with Holloway and J.S. after the incident.

---

[5] In his reply in support of partial summary judgment, Plaintiff cites the testimony of Michael Schmidt, the CP representative who took J.S.'s statement, to shore up the admissibility of J.S.'s interview transcript. (R. 71 at 4.) Plaintiff's counsel, however, did not identify the transcript as an exhibit or ask the witness to confirm its identity and authenticity. (Pl.'s Ex. 7, p. 16.)

[6] Plaintiff also attempts to dispute the admissibility of Defendant's evidence, pointing out that the December 2, 2015, investigative hearing transcript is not official testimony but is more akin to a statement. (R. 64 at ¶ 47; R. 71 at 4.) While Plaintiff is correct that "nowhere does it state the witnesses were sworn under oath," Plaintiff Holloway himself identified and authenticated the investigative hearing transcript during his deposition. (R. 53-1, Def.'s Ex., Tab A, pp. 155-56 (155: 8-11 reads "Q. Looking at Exhibit 31 does that reflect a copy of the hearing transcript from the December 2nd, 2015 hearing? A. Looks like it, yes.").) Further, Defendant offers the signed declaration of attorney Tracey Holmes Donesky that states that the December 2, 2015, hearing transcript and exhibits were attached to Holloway's deposition. (R. 53 at 4.) This evidence is admissible under Civil Procedure Rule 56(c)(1)(A) and Evidence Rule 901(b)(1).

This evidence also constitutes inadmissible hearsay because a party cannot bring in another witness's statement about J.S.'s knowledge to show that this is what J.S. knew. Moreover, Plaintiff has failed to identify any exception to the hearsay rule under which the Court could admit J.S.'s interview transcript or other evidence regarding J.S.'s negligence. *See Cairel,* 821 F.3d at 830 ("If the evidence is inadmissible hearsay, the courts may not consider it" at summary judgment).

Accordingly, viewing the evidence and all reasonable inferences in Defendant's favor, Plaintiff has not established – as a matter of law – causation, foreseeability, duty, and breach – as required under the FELA. *See Crompton,* 745 F.3d at 296. Instead, triable issues of fact remain. The Court therefore denies Plaintiff's motion for summary judgment on his FELA claim alleged in Count I.

## II.     Count II: Title VII of the Civil Rights Act of 1964

Next, Defendant moves for summary judgment on Count II, Holloway's Title VII reverse discrimination claim based on his gender. In response, Holloway seeks to establish his reverse discrimination claim under the indirect, burden-shifting method per *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified for reverse racial discrimination cases by *Mills v. Health Care Service Corp*., 171 F.3d 450, 457 (7th Cir. 1999). To establish his reverse discrimination claim, Holloway must set forth evidence showing that: "(1) background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated individuals who are not members of his protected class." *Formella v. Brennan*, 817 F.3d 503,

511 (7th Cir. 2016) (quotations omitted); *see also Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009).

Under the familiar burden-shifting method, if Holloway meets his burden of establishing all four factors of his *prima facie* case, the burden shifts to CP to "provide a legitimate, non-discriminatory reason for the [adverse employment] decision." *Formella*, 817 F.3d at 511 (quotation omitted). If CP provides a legitimate, non-discriminatory reason for terminating Holloway's employment, the burden shifts back to Holloway to show that CP's reasons are a pretext for discrimination. *Id.*; *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

As Plaintiff recognizes, the Seventh Circuit has called into question the distinction between the direct and indirect methods of proof in employment discrimination cases. *See Ortiz v. Werner Enters., Inc.,* 834 F.3d 760 (7th Cir. 2016). Nonetheless, "[n]o matter the framework employed, the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortgage Corp.,* 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz,* 834 F.3d at 765). "In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Reed,* 869 F.3d at 547-48.

Here, Plaintiff has failed present evidence raising a triable issue of fact as to why CP may have any reason or inclination to discriminate against men or what background circumstances demonstrate any such "fishy" bias under the first *prima facie* element. *See Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009). In other words, at this procedural posture, Holloway must set forth some "evidence sufficient to support a reasonable probability"

that but for his gender, the challenged employment decision would not have occurred. *See Mills*, 171 F.3d at 456. Holloway does not offer any such theories or point to evidence in the record that would lead to a reasonable inference concerning CP's bias against men. *See id.* at 456-57 ("it is the unusual employer who discriminates against majority employees").

Moreover, Holloway does not set forth sufficient facts demonstrating the second element of his *prima facie* reverse discrimination claim, namely, he has not demonstrated an issue of triable fact exists as to whether he had been meeting his employer's legitimate job expectations at the time of his discharge. Specifically, is undisputed that Plaintiff failed 5 out of 55 efficiency tests. It is also undisputed that Plaintiff had two previous suspensions for over a week each, received a coaching letter, and a suspension for failing to meet attendance/availability requirements—all in the span of about one year. Furthermore, at the time of the Kubota incident, Plaintiff was awaiting another hearing on his attendance/availability issues. Despite this evidence, Plaintiff believes that CP incorrectly determined some of his past suspensions and notices, although he did not appeal these disciplinary actions through his union's CBA procedures. [7] Even if CP incorrectly decided certain disciplinary measures, Plaintiff has not set forth any objective evidence that he satisfied CP's legitimate expectations in light of the remainder of his disciplinary record. *See McKinney v. Office of Sheriff of Whitley Cnty.,* 866 F.3d 803, 813 (7th Cir. 2017).

Next, Holloway has failed to present sufficient evidence to support the fourth element of his *prima facie* reverse discrimination claim. More specifically, he has not identified any similarly-situated female employees who CP treated more favorably. "A similarly situated

---

[7] The Court notes that it cannot adjudicate previous employment disciplinary hearings, but takes the disciplinary record into account as part of its overall review of the case. *See, e.g., Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1181 (7th Cir. 2002) (holding that a district court does not sit as a "super personnel department that second-guesses employer's business judgments").

employee must be directly comparable to the plaintiff in all material respects, which is a common-sense, flexible analysis of relevant factors." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (citations omitted). These factors may include whether the employees had the same supervisor, were subject to the same employment standards, and engaged in similar conduct. *Id*. It is well-established that "the purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Humphries v. CBOCS West, Inc*., 474 F.3d 387, 405 (7th Cir. 2007).

As discussed, Holloway only compares himself to one woman comparator, J.S. Holloway and J.S. are not similarly-situated because the undisputed facts show that they have significantly different employment disciplinary histories and efficiency testing records. *See, e.g*., *Hester v. Indiana State Dep't of Health*, 726 F.3d 942, 948 (7th Cir. 2013) (fellow employees not comparable because they were not "placed on a Work Improvement Plan after unsatisfactory performance," "required to pass an examination with 100% accuracy in order to remain employed," and "failed the test despite this condition"). In particular, J.S. had no efficiency test failures, whereas Plaintiff had five. Also, J.S.'s December 2014 coaching letter constituted her only discipline during her employment with CP.

Even if Holloway had set forth sufficient evidence of a *prima facie* case of reverse discrimination, CP has successfully rebutted this evidence by offering a "legitimate, nondiscriminatory reason" for its adverse employment action. *Formella*, 817 F.3d at 511. In particular, Defendant explains that it terminated Holloway's employment because the Kubota incident was the most recent addition to his significant disciplinary record over Holloway's short tenure at CP and Holloway has not provided evidence that would cast doubt on CP's reason for

terminating his employment. *See Arrigo v. Link,* 836 F.3d 787, 796 (7th Cir. 2016) ("The pretext inquiry asks not whether an employer correctly believed an employee was performing poorly, but rather whether the employer honestly believed."). To clarify, for Holloway to prevail on a motion for summary judgment in a Title VII action, he must produce evidence from which a rational trier of fact could infer that CP lied about its proffered reasons for dismissing him. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) ("'Pretext' is more than a mere mistake; it 'means a lie'—a 'phony reason' for the employment action"). "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella*, 817 F.3d at 513–14.

Here, Holloway attempts to call into question the truthfulness of CP's stated reason for terminating his employment by arguing that CP did not discipline J.S. even though she caused the Kubota incident as the driver of the vehicle. Plaintiff also points out that CP found him at fault for both riding in the Kubota without his seatbelt and for operating the Kubota in an unsafe manner – when it is undisputed that he was not the driver. At best, these facts show that CP's decision may have been mistaken for not taking into account J.S.'s alleged misconduct in the Kubota incident – but CP relied upon more than the Kubota incident in terminating Holloway's employment, as discussed in detail above. *See Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590 (7th Cir. 2017) ("[P]retext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer") (citation omitted). Simply put, these facts do not raise a reasonable inference that CP's proffered reason is a lie. In sum, Holloway has not "present[ed] evidence showing that…a rational jury could conclude that the employer took that adverse action on account of [his] protected class, not for any non-invidious reason." *Hester*, 726 F.3d at 946–47.

Construing the facts and all reasonable inferences in his favor – as the Court is required to do at this procedural posture – Holloway has not presented sufficient evidence creating a genuine issue of material fact for trial concerning his reverse sex discrimination claim. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017) (If plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted.") (quoting *Celotex*, 477 U.S. at 322). The Court therefore grants Defendant's summary judgment motion in regard to Plaintiff's Title VII claim as alleged in Count II.

## III. Count III: Federal Railroad Safety Act

Both parties move for summary judgment on Count III, Holloway's FRSA claim. FRSA "forbids a railroad to discharge or otherwise discriminate against an employee for conduct protected by the Act, including notifying the railroad that he has suffered a work-related injury." *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 874 (7th Cir. 2016) (citing 49 U.S.C. § 20109(a), (a)(4)). FRSA explicitly incorporates by reference the rules and procedures, including the two-party burden-shifting test, applicable to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21") whistleblower cases.[8] 49 U.S.C. § 20109(d)(2)(A); 49 U.S.C. § 42121(b)(2)(B)(i)-(ii); *see also Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013). Under this standard, Holloway must establish a *prima facie* case by showing by a preponderance of the evidence that (1) he engaged in a protected activity; (2) CP knew or suspected, actually or constructively, that he engaged in the protected activity; (3) he suffered an adverse or unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in that adverse or unfavorable employment

---

[8] The Department of Labor has promulgated regulations that adopt this burden-shifting standard to FRSA complaints filed with the Department of Labor. *See* 29 C.F.R. § 1982.104(e)(3)-(4).

action.  *See* 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2).  *See also Araujo*, 708 F.3d at 157.  Under the fourth element, a "contributing factor" is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."  *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (citation omitted); *see also Armstrong v. BNSF Ry. Co.,* 128 F. Supp. 3d 1079, 1091 (N.D. Ill. 2015).  If Holloway makes a prima facie showing, the burden then shifts to CP to "demonstrate[], by clear and convincing evidence, that [it as] the employer would have taken the same unfavorable personnel action in the absence of…[Holloway's] behavior."  49 U.S.C. § 42121(b)(2)(B)(ii).

The Court focuses on the fourth element of Holloway's *prima facie* FRSA case, namely, that his protected activity was a contributing factor in CP's adverse or unfavorable employment action, because it is dispositive.  Here, Holloway asserts that the protected activity at issue is that he reported a work-related injury and sought medical care.  *See Koziara*, 840 F.3d at 874 ("The Federal Railroad Safety Act forbids a railroad to discharge or otherwise discriminate against an employee for conduct protected by the Act, including notifying the railroad that he has suffered a work-related injury.").  "Under the FRSA's 'contributing factor' standard for causation, Plaintiff need not conclusively demonstrate Defendant's retaliatory motive; the contributing factor that Plaintiff must prove is intentional retaliation prompted by the employee engaging in protected activity."  *Armstrong,* 128 F. Supp. 3d at 1091; *see also Koziara*, 840 F.3d at 878 (FRSA "does not punish railroads for disciplining (including firing) employees unless the discipline is retaliatory.").

Here, Holloway has not presented evidence that reporting his work-related injury had any effect on CP terminating his employment.  Instead, without factual substantiation, Holloway argues that it is obvious that his protected act was a contributing factor to CP's termination of his

employment explaining that the notice of a formal investigation and resultant hearing was a "charade" for the sole purpose of firing him for reporting a work injury. It is well-settled, however, that "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017) (citation omitted). In short, Holloway's bare-boned arguments are not supported by "evidence of pretext, shifting explanations, antagonism or hostility toward Plaintiff's protected activity, or a change in attitude toward Plaintiff after he engaged in the protected activity." *Kuduk*, 768 F.3d at 790. Moreover, there is "no evidence of the usual forms of employment discrimination, certainly, and no evidence that the suspension and discharge of the plaintiff were motivated by animus." *Koziara*, 840 F.3d at 878; *see also BNSF Ry. Co. v. United States Dep't of Labor Admin. Review Bd.,* 867 F.3d 942, 946 (8th Cir. 2017) ("Absent sufficient evidence of intentional retaliation, a showing that protected activity initiated a series of events leading to an adverse action does not satisfy the FRSA's contributing factor causation standard.").

Again, Holloway takes issue with the fact that J.S. was the driver of the Kubota, and that CP did not discipline J.S. These facts, however, do not raise a reasonable inference that Holloway's report of a work-related injury was a contributing factor to his termination for purposes of the FRSA, especially in light of the fact that J.S. was furloughed at the time of the December 2015 hearing and seeking new employment at that time. Instead, examining the evidence and all reasonable inferences in Holloway's favor, the undisputed facts show that CP investigated the Kubota incident, gave written notice of a hearing, conducted a formal hearing with testimony and witnesses (albeit without J.S. present), reviewed the recommendation for dismissal, and allowed Holloway to appeal the decision. The Court therefore grants Defendant's

summary judgment motion and denies Plaintiff's summary judgment motion with regard to Holloway's FRSA claim in Count III.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion for partial summary judgment and grants Defendant's motion for partial summary judgment. As such, the Court dismisses Plaintiff's Title VII reverse discrimination claim and FRSA claim from this lawsuit.

**Dated:** January 19, 2018

**ENTERED:**

**AMY J. ST. EVE**
**United States District Court Judge**